**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**TIMOTHY DRAWBRIDGE, TIMOTHY J.**
**DRAWBRIDGE, SR. and JOSEPHINE T.**
**DRAWBRIDGE,**

                                    **Plaintiffs,**

                    **v.**                                          **1:21-CV-117**
                                                                    **(FJS/CFH)**

**SCHENECTADY COUNTY DEPARTMENT OF**
**SOCIAL SERVICES, SCHENECTADY COUNTY,**
**and NORTHEAST PARENT AND CHILD**
**SERVICES, INC.,**

                                    **Defendants.**
_____

**APPEARANCES**                              **OF COUNSEL**

**COMETTI LAW FIRM**                         **MARIO D. COMETTI, ESQ.**
P.O. Box 372
Delmar, New York 12054
Attorneys for Plaintiffs

**GOLDBERG SEGALLA, LLP**                    **JOHATHAN M. BERNSTEIN, ESQ.**
8 Southwoods Boulevard, Suite 300            **MARIA K. DYSON, ESQ.**
Albany, New York 12211-2525
Attorneys for Defendants Schenectady
Department of Social Services and
Schenectady County

**BLACK MARJIEH & SANFORD LLP**             **SHERYL SANFORD, ESQ.**
100 Clearbrook Road, Suite 345               **CASSANDRA CHIARAMONTE, ESQ.**
Elmsford, New York 10523                     **CORINNE M. SCOTTI, ESQ.**
Attorneys for Defendant Northeast
Parent & Child Society, Inc.

**SCULLIN, Senior Judge**

# I. INTRODUCTION

Pending before the Court are the following motions: (1) Defendants Schenectady County and Schenectady County Department of Social Services' (collectively "Defendant County") motion to dismiss Count IV of the Amended Complaint asserting negligence as time barred pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; (2) Defendant County's motion to dismiss with prejudice Counts I, II, III and IV of the Amended Complaint pursuant to Rule 12(c) of the Federal Rules of Civil Procedure, all cross-claims, punitive damages, as well as any and all claims that Plaintiffs Timothy J. Drawbridge, Sr. and Josephine T. Drawbridge (collectively "Plaintiff Grandparents") have asserted; and (3) Defendant County's motion to dismiss the entire complaint against Defendant Schenectady County's Department of Social Services as duplicative.

# II. DISCUSSION

## A.     Preliminary matters

Plaintiffs have stated that they have no objection to Defendant County's motion to dismiss Count IV of the Amended Complaint, which asserts a state-law claim of negligence, as time barred.  Nor do Plaintiffs have any objection to Defendant County's motion to dismiss all of the claims against Defendant Schenectady County's Department of Social Services ("DSS"). Accordingly the Court grants Defendant County's motion to dismiss all of Plaintiffs' claims against DSS because DSS is not a suable entity and Plaintiffs' state-law negligence claim against Defendant County as time-barred.

**B.     Defendant County's motion to dismiss the claims of Plaintiff Grandparents**

In their Amended Complaint, Plaintiffs allege that Defendant County through its Department of Social Services ("DSS") refused Plaintiff Grandparents access to their granddaughter during all relevant state-court proceedings.  *See* Dkt. No. 44, Plaintiffs' Opposition Memorandum of Law, at 21 (citing [Amended Complaint at ¶]¶ 75-77).  Specifically, they assert that, "[d]espite repeated requests by [Plaintiff] Father, . . . [Plaintiff] Grandparents were precluded from seeing their Granddaughter, when prior to the relevant proceedings they would see her substantially.  Thus [Defendant] County expressly prohibited [Plaintiff] Grandparents from exercising their relationship with the[ir granddaughter], utilizing the egregious circumstances and legal proceedings brought against [Plaintiff] Father as a basis."  *See id.* at 22.  Furthermore, Plaintiffs allege that, "[a]t all times relevant herein, [Plaintiff Grandparents] had constitutional rights, including the right to enjoy time and associate with their Grandchild."  *See* Dkt. No. 11, Amended Complaint, at ¶ 127.  Finally, in general terms, Plaintiffs assert that "each of the employees and personnel of Schenectady County DSS conspired, directly or indirectly, for the purpose of depriving Plaintiffs of Equal Protection of the law, substantive and procedural due process."  *See id.* at ¶ 133.

In *Finch v. City of New York*, 591 F. Supp. 2d 349 (S.D.N.Y. 2008), the plaintiff grandmother brought suit under 42 U.S.C. § 1983 claiming damages for due process violations that she alleged the defendant and its employees committed by not placing her grandchild into her custody and restricting her visitation rights with her grandchild.

The court began its analysis by noting that "[c]ourts '"examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has

been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient."'" *Finch*, 591 F. Supp. 2d at 358-59 (quoting *Valmonte*, 18 F.3d at 998 (quoting *Kentucky Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S. Ct. 1904, 104 L. Ed. 2d 506 (1989))).  Furthermore,

> [t]he court determines what process is due by considering three factors: *first*, the private liberty or property interest that will be affected by the official action, *second*, the risk of erroneous deprivation of that interest through the procedures used, and the value of any alternative or substitute procedural safeguards, and *third,* the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 359 (citing *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976)).

Finally, the court concluded that "the lack of federal case law identifying or defining a grandparent's constitutional right to visit her grandchildren suggests that [defendant] did not deny [plaintiff] any constitutionally protected liberty interest"; and, therefore, the court granted the defendant's motion for summary judgment concerning the plaintiff's claimed damages for restricted visitation  *See id.* at 362.  Other courts that have addressed this issue have reached the same conclusion.  *See, e.g.*, *Brown v. Ives*, 129 F.3d 209, 211 (1st Cir. 1997) (holding grandfather's due process right to family integrity is not clearly established); *Mullins v. Oregon*, 57 F.3d 789, 794 (9th Cir 1995) (holding grandparents had no substantive due process right to grandchildren); *Wiley as next friend of C.S.B. v. Dunbar*, No. 6:20-CV-01059-ADA-JCM, 2021 WL 4622424, *5 (W.D. Tex. July 28, 2021) (noting that "[s]everal federal courts have held that a non-custodial grandparent does not possess either a substantive due process right to family integrity and association or a liberty interest in visitation" (citations omitted)); *Buck v. Greenlee*, No. 3:10-cv-540-RJC-DSC, 2011 WL 4595262, *7 (W.D.N.C. Sept. 30, 2011) (stating that "Grandparents have no constitutional right to visitation" (citation omitted)), *aff'd*, 465 F. App'x

244 (4th Cir. 2012)); *Garmhausen v. Holder*, 757 F. Supp. 2d 123, 143 (E.D.N.Y. 2010) (stating

that "[t]he Grandparents cannot assert a cause of action under *Bivens* related to the grandparental

visitation order because they lack a constitutional right upon which to base their claim.  The

Supreme Court has held that grandparents do not have a recognized liberty interest in visitation

as against an unwilling mother.  (citing *Traxel v. Granville*, 530 U.S. 57, 120 S. Ct. 2054, 147 L.

Ed. 2d 49 (2000))); *Bellet v. City of Buffalo*, No. 03-CV-27S, 2009 WL 2930464, *5 n.7

(W.D.N.Y. Sept. 11, 2009) (stating that "[t]here is no constitutional right to visitation by

grandparents" (citation omitted)).

Based on the above-cited case law, the Court finds that Plaintiff Grandparents have no

constitutional right to visitation with their granddaughter.  Therefore, the Court grants Defendant

County's motion to dismiss all of Plaintiff Grandparents' claims against it.

**C.      Defendant County's motion to dismiss Counts II and III of the Amended Complaint**

In Count II of their Amended Complaint, Plaintiffs allege that "each of the employees

and personnel of Schenectady County DSS conspired, directly or indirectly, for the purpose of

depriving Plaintiffs of Equal Protection of the law, substantive and procedural due process."  *See*

Dkt. No. 11, Amended Complaint, at ¶ 133.

As Defendant County notes in its motion to dismiss Count II, such a cause of action is

barred by the intracorporate conspiracy doctrine.  *See Rodriguez v. Cnty. of Nassau*, No. 18-CV-

03845 (JMA) (JMW), 2023 WL 2667076, *8 n.8 (E.D.N.Y. Mar. 28, 2023) (explaining that the

intracorporate conspiracy doctrine "posits that officers, agents and employees of a single

corporate or municipal entity, each acting within the scope of his employment, are legally

incapable of conspiring together'" (quoting *Cruz*, 2009 WL 2567990, at *6 (citing *Hermann v.*

*Moore*, 576 F.2d 453, 459 (2d Cir. 1978) ("[T]here is no conspiracy [under Section 1985] if the conspiratorial conduct challenged is essentially a single act by a single corporation acting exclusively through its own . . . officers[] and employees, each acting within the scope of his employment."))). Therefore, the Court grants Defendant County's motion to dismiss Count II of Plaintiffs' complaint.

In Count III of Plaintiffs' Amended Complaint, they allege another § 1983 conspiracy claim. *See* Dkt. No. 11 at ¶¶ 138-145. In support of this claim, Plaintiffs allege that, "[a]fter the February 27, 2018 MDT Meeting Schenectady County DSS employees reached an agreement amongst themselves to frame [P]laintiff Timothy Drawbridge with allegations of neglect of his Child and for alleged violations of the 5/3/17 Order, and to thereby deprive Plaintiff of his constitutional rights . . . ." *See id.* at ¶ 139. They further allege that, "[i]ndependently, before and after the March 2018 Neglect Petitions, each of the employees and supervisors of the Schenectady County DSS further conspired, and continue to conspire, to deprive Plaintiff of exculpatory materials to which he was lawfully entitled and which would have led to his more timely exoneration of the false charges of neglect and violation as described in the various Paragraphs of this Complaint." *See id.* at ¶ 140. Finally, they allege that "the employees and including persons who are not members of DSS, have conspired by concerted action to accomplish an unlawful purpose by an unlawful means." *See id.* at ¶ 141.

In their opposition to Defendant County's motion, Plaintiffs did not respond to Defendant County's motion to dismiss this claim. Moreover, there are no factual allegations in the Amended Complaint to suggest that Defendant County's DSS's employees conspired with anyone other than their fellow employees. Accordingly, the Court grants Defendant County's motion to dismiss Count III of the Amended Complaint.

**D.      The *Rooker-Feldman* doctrine and Count I of the Amended Complaint[1]**

In its reply to Plaintiffs' opposition to its motion to dismiss, Defendant County argued

that "the Amended Complaint shows that any limits placed on [P]laintiff [Father's] parental

rights were at the direction of Family Court not [D]efendant [County]  (See Amended

Complaint, paragraphs 11 and 95).  Plaintiff [Father] cannot use the rulings of Family Court to

wage a claim against [Defendant County]."  *See* Dkt. No. 51-3, Defendant County's Reply

Memorandum of Law, at 24.  Thus, Defendant County asserted  that "[t]he *Rooker-Feldman*

doctrine bars direct review by this Court of the Family Court's decision."  *See id.* (citing *Rooker*

*v. Fidelity Trust Co.*, 263 U.S. 413 [1923]; *District of Columbia Court of Appeals v. Feldman*,

460 U.S. 462 [1983]).

Even if Defendant County had not raised this issue, "[b]ecause *Rooker-Feldman*

implicates a court's subject-matter jurisdiction, . . . [the Court] may address the doctrine's

applicability *sua sponte*."  *Voltaire v. Westchester Cty. Dep't of Soc. Sec.*, No. 11-CV-8876 (CS),

2016 WL 4540837, *9 n.16 (S.D.N.Y. Aug. 29, 2016) (citing *Morris v. Sheldon J. Rosen, P.C.*,

No. 11-CV-3356, 2012 WL 2564405, at *3 (E.D.N.Y. July 2, 2012) (collecting cases), *aff'd sub*

*nom. Morris v. Rosen*, 577 Fed. Appx. 41 (2d Cir. 2014) (summary order)).[2]

---

[1] Since the Court has granted Defendant County's motion to dismiss all of Plaintiff Grandparents' claims against it, only Plaintiff Father can assert a claim for relief under 42 U.S.C. § 1983 against Defendant County.

[2] Since Defendant County did not raise the *Rooker-Feldman* issue until it filed its reply memorandum, the Court provided Plaintiffs with an opportunity to respond to this issue and instructed the parties to submit all relevant state-court documents so that the Court would have a complete picture of what had occurred in state court.

In *Hansen v. Miller*, 52 F.4th 96 (2d Cir. 2022), the Second Circuit's most recent foray into the *Rooker-Feldman* field, the Second Circuit explained the limited breadth of that doctrine after the Supreme Court's decision in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280 (2005).  In *Hansen*, Ms. Miller initiated a New York State Court foreclosure action against Stillwell Road, Inc. ("SRI").  In that action, she asserted her interests in a residential property (the "Property") under her recorded mortgage (the "Rachel Mortgage").  Foreclosure would eliminate Plaintiff Hansen's unrecorded security agreement and related interest in the Property. In time, the state court issued a foreclosure judgment in favor of Ms. Miller and rejected Plaintiff Hansen's counterclaims, in which she alleged that the Rachel Mortgage was invalid and unenforceable.

After the state court entered the foreclosure judgment, Ms. Hansen initiated a federal action against, among others, two attorneys and their law firms jointly (the "Attorney Defendants") and another attorney and his P.C. jointly (the "Balanoff Defendants").  Ms. Hansen brought claims for fraud in the enforcement of the Rachel Mortgage, fraud upon the court, collusion and deceit upon the court in violation of New York Judiciary Law § 487, and negligence.  The district court dismissed Ms. Hansen's claims, on the grounds that "in light of the prior state-court judgment, the *Rooker-Feldman* doctrine precluded it from adjudicating [Ms. Hansen's] claims and that, in the alternative, principles of *res judicata* or collateral estoppel barred her from pursuing [those] claims."  *Id.* at 98-99 (citation omitted).  On appeal, the Second Circuit held, among other things, that the *Rooker-Feldman* doctrine did not require dismissal of Ms. Hansen's claims against the Attorney Defendants.

The court explained that "[t]he *Rooker-Feldman* doctrine prohibits federal courts from exercising jurisdiction over suits challenging final state court orders when doing so would

'essentially amount to appeals of state court judgments.'" *Hansen*, 52 F.4th at 100 (quoting

*Vossbrink v. Accredited Home Lenders, Inc.*, 773 F.3d 423, 426 (2d Cir. 2014)) (other citations

and footnote omitted).  The court also stated that it had "emphasized that the *Rooker-Feldman*

doctrine bars district courts from exercising jurisdiction over otherwise properly adjudicated

claims only if the plaintiff 'complain[s] of injuries caused by a state court judgment.'" *Id.*

(quoting *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005)).  Therefore,

as the court had explained in *Vossbrink*, "the doctrine generally does not affect a federal court's

jurisdiction over claims for damages against third parties for alleged misconduct occurring in the

course of a state court proceeding, because the adjudication of such claims would 'not require the

federal court to sit in review of the state court judgment.'" *Id.* (quoting [*Vossbrink*,] 773 F.3d at

427); (citing *Sykes v. Mel S. Harris Assocs. LLC*, 780 F.3d 70, 94-95 (2d Cir. 2015) (finding

*Rooker-Feldman* inapplicable where plaintiff's claims "sp[oke] not to the propriety of the state

court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining

such judgments")).  Thus, because Ms. Hansen's claims against the Attorney Defendants were for

fraud in the procurement of the state court foreclosure judgment, the Second Circuit found that

those claims could be considered independently of the merits of the foreclosure; and, therefore,

*Rooker-Feldman* did not bar the district court from hearing those claims.  *See id.*

The Eleventh Circuit in *Behr v. Campbell*, 8 F.4th 1206 (11th Cir. 2021), reached the

same conclusion in a case involving loss of custody.  In that case, after a difficult series of child

custody interventions and state proceedings, the plaintiff and two of his children filed a 30-count

pro se complaint in federal district court asserting a wide variety of constitutional, statutory and

tort claims against 18 named defendants.  The district court, seeing that the claims were related

to the plaintiffs' earlier state-court litigation, dismissed the entire complaint on *Rooker-Feldman*

grounds.  On appeal, the Eleventh Circuit disagreed, finding that several of the claims that the

plaintiffs had raised did not fall within *Rooker-Feldman*'s narrow bounds.

The court began by noting that, in *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544

U.S. 280 (2005), the Supreme Court had restored *Rooker-Feldman* to its original boundaries, *i.e.*,

that this doctrine

> occupies "narrow ground" and is "confined to cases of the kind
> from which the doctrine acquired its name" – that is, *Rooker* and
> *Feldman* . . . [which] held that state court litigants do not have a
> right of appeal in the lower federal courts; they cannot come to
> federal district courts "complaining of injuries caused by state-
> court judgments rendered before the district court proceedings
> commenced and inviting district court review and rejection of
> those judgments."

*Behr*, 8 F.4th at 1209-10 (quoting *Exxon Mobil*, 544 U.S. at 284, 125 S. Ct. 1517) (footnote

omitted).

The court further explained that "[o]nly when a losing state court litigant calls on a

district court to modify or 'overturn an injurious state-court judgment' should a claim be

dismissed under *Rooker-Feldman*; district courts do not lose subject matter jurisdiction over a

claim 'simply because a party attempts to litigate in federal court a matter previously litigated in

state court.'"  *Id.* at 1210 (quoting *Exxon Mobil*, 544 U.S. at 292-93, 125 S. Ct. 1517).  Thus, the

question is "whether the claims raised before the district court were 'brought by state-court losers

complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments.'"  *Id.*

(quoting [*Nicholson v. Shafe*, 558 F.3d 1266, 1274 (11th Cir. 2009)] (quoting *Exxon Mobil*, 544

U.S. at 284, 125 S. Ct. 1517)) (other citations omitted).  "Finding a claim 'to be barred by

*Rooker-Feldman*, requires that it amount to a direct attack on the underlying state court

decision.'"  *Id.* at 1212 (quoting [*Nicholson*, 558 F.3d] at 1288).  However, the court explained

that "*Rooker-Feldman* . . . does not block claims that 'require some reconsideration of a decision of a state court' if the plaintiff presents 'some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party.'"  *Id.* (quoting [*Nicholson*, 558 F.3d at 1288 (quoting *Exxon Mobil*, 544 U.S. at 293, 125 S. Ct. 1517)).  Thus, "[t]he injury must be caused by the judgment itself.  Period.  And considering whether a claim is 'inextricably intertwined' with a state court judgment is not a second prong of the analysis; it is merely a way of ensuring that courts do not exercise jurisdiction over the appeal of a state court judgment simply because the claimant does not call it an appeal of a state court judgment."  *Id.*

The *Behr* court also found that, when determining whether *Rooker-Feldman* applies, a "claim-by-claim approach is the right one."  *Id.* at 1213.  "*Rooker-Feldman*, being a narrow and limited doctrine, required a more targeted approach.  The question isn't whether the whole complaint seems to challenge a previous state court judgment, but whether resolution of each individual claim requires review and rejection of a state court judgment."  *Id.*

Finally, the *Behr* court stated that "the claim for relief does matter.  Because *Rooker-Feldman* bars only claims that invite a district court's 'review and rejection' of a state court judgment, claims that seek only damages for constitutional violations of third parties – not relief from the judgment of the state court – are permitted."  *Id.* at 1214 (citing *VanderKodde v. Mary Jane M. Elliott, P.C.*, 951 F.3d 397, 402 (6th Cir. 2020) (the court cannot determine whether the plaintiff's injury arises from the state court judgment and is barred by *Rooker-Feldman* "without reference to the plaintiff's request for relief" (alternations adopted) (quotation omitted))).

In the Amended Complaint, Plaintiff Father's first claim against Defendant County is a *Monell* claim brought pursuant to 42 U.S.C. § 1983, in which he alleges that Schenectady County DSS filed the March 2018 Neglect Petitions "as a consequence of the Schenectady

County DSS's gross negligence and/or with deliberate, knowing indifference, and without regard to internally created standards (to the extent they existed) and in contradiction of uniform and universally accepted best practices."  *See* Amended Complaint at ¶ 128.  Plaintiff Father further alleges that the

> deliberate, and knowing indifference of Schenectady County DSS is evidenced by and as a consequence of their employees (1) conducting repeated unnecessary and emotionally abusive forensic interviews of the Child; (2) allowing an unqualified, unlicensed third party to conduct an unnecessary and emotionally abusive forensic interview of the Child; (3) fail[ing] to properly train their employees, or to knowingly allow employees to fail to adhere to proper and accepted practices for (a) conducting an investigation of abuse and/or neglect as reported outside the confines of a "hotline" call; (b) conducting an investigation of abuse and/or neglect as reported from a "hotline" call; (c) conducting a forensic interview of a child alleged to have been the subject of abuse or neglect; (d) avoiding bias, implicit or explicit with regard to such investigations and interviews; (e) recording or otherwise documenting actions, conclusions, and procedures to ensure compliance [with] internal, Statewide and universally accepted practices for investigations and interviews; and (4) . . . failing to create or otherwise provide accepted policies and procedures.

*See id.* at ¶ 129.

Finally, Plaintiff Father asserts that, as a result of this conduct, he has suffered general and special damages in an amount to be proven at trial, including, but not limited to (1) emotional pain and suffering, (2) emotional pain and suffering to the Child, (3) permanent damage with regard to his relationship with his Child; (4) unnecessary expenditure of legal fees and (5) damage to reputation.  *See id.* at ¶ 130.

Nowhere in his Amended Complaint does Plaintiff Father challenge the state court judgment nor do any of his allegations require the Court to review the state-court judgment. Rather, Plaintiff Father seeks damages against Defendant County for the actions of its employees in conducting an investigation of a hot line call and their decision to file neglect petitions against

him, which he contends violated his constitutional right to substantive due process.  Based on the allegations in the Amended Complaint related to this claim, the Court finds that *Rooker-Feldman* does not deprive this Court of jurisdiction to adjudicate Plaintiff Father's first cause of action against Defendant County under *Monell* and § 1983 for deprivation of his constitutional right to substantive due process.[3]

E.      **Defendant County's motion to dismiss Plaintiff Father's *Monell* claim**

"A motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6) tests the legal sufficiency of a party's claim for relief." *Julie A. Su, Acting Sec'y of Labor, United States Dep't of Labor v. Kwiat Eye & Laser Surgery, PLLC,* No. 1:22-cv-00264 (AMN/DJS), 2023 WL 4847315, *2 (N.D.N.Y. July 28, 2023) (citing *Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007)).  Furthermore, "[i]n considering the legal sufficiency [of a claim], a court must accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in the [plaintiff's] favor." *Id.* (citing *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted)).  This presumption of truth, however, does not extend to legal conclusions.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citation omitted).

To survive a motion to dismiss, a party need only plead "a short and plain statement of the claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (quotation omitted).

---

[3] The Court notes that, with regard to the issue of whether Plaintiff Father was a loser in state court, courts in the Second Circuit, based on the Supreme Court's recent decision in *Thompson v. Clark*, 142 S. Ct. 1332 (2022), at least in the context of a malicious prosecution claim, "have deemed an ACD 'a favorable termination.'" *Britt v. Doe*, No. 3:22-CV-0692 (GLS/ML), 2022 WL 16579207, *9 n.8 (N.D.N.Y. Oct. 13, 2022) (quoting *Price v. Peress*, 18-CV-4393, 2022 WL 4638148, at *11 (E.D.N.Y. Sept. 30, 2022)) (other citations omitted).

Under this standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the speculative level," *id.* at 555 (citation omitted), and present claims that are "plausible on [their] face," *id.* at 570.   "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  *Iqbal*, 556 U.S. at 678 (citation omitted).   "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of "entitlement to relief."'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S. at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to plausible, the[] complaint must be dismissed," *id.* at 570.

To sufficiently allege a *Monell* claim against a municipal defendant, a plaintiff must, first, allege a plausible claim that his constitutional rights were violated.  *See Segal v. City of New York*, 459 F.3d 207, 219 (2d Cir. 2006) (stating that "*Monell* does not provide a separate cause of action for the failure by the government to train its employees; it *extends* liability to a municipal organization where that organization's failure to train, or the policies or customs that it has sanctioned, led to an independent constitutional violation" (citing *Monell*, 436 U.S. at 694, 98 S. Ct. 2019 (involving a policy that was "the moving force of the constitutional violation"); *see also City of Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989) (involving a failure to train municipal employees that led to the constitutional injury)); *see also Arizona Hudson Valley LLC v. Allen*, No. 1:22-CV-1306, 2023 WL 3936640, *5 n.6 (N.D.N.Y. June 9, 2023) (stating that, "[w]ithout an underlying constitutional violation, there is no *Monell* liability").

In this case, Plaintiff Father appears to allege that DSS employees violated his constitutional right to substantive due process by interfering with his "parental rights, including the right to enjoy and participate in the parenting of his child." *See* Dkt. No. 11, Amended Complaint, at ¶ 126.[4]  "'[S]ubstantive due process rights are violated only by conduct "so outrageously arbitrary as to constitute a gross abuse of governmental authority."'" *Arizona Hudson Valley LLC*, 2023 WL 3936640, at *6 (quoting *Puckett*, 631 F. Supp. 2d at 237 (quoting *Natale v. Town of Ridgefield*, 170 F.3d 258, 263 (2d Cir. 1999))).  In the context of family relationships, generally, family members have a substantive due process right "'to remain together without the coercive interference of the awesome power of the state'" *Anthony v. City of New York*, 339 F.3d 129, 142 (2d Cir. 2003) (quotation omitted)  "In order to make out a violation of this right, a plaintiff must plausibly allege that a state decision or action violated its fundamental right and that 'no overridingly important state interest justifie[d] that infringement.'" *Voltaire v. Westchester Cty. Dep't of Soc. Servs.*, No. 11-CV-8876 (CS), 2016 WL 4540837, *8 (S.D.N.Y. Aug. 29, 2016) (quoting *Marcel*, 2012 WL 5463926, at *4 (citing *Daniels v. Williams*, 474 U.S. 327, 331 (1986))).  "In particular [the plaintiff] must plausibly allege that [his] separation from [his] child[] was 'so shocking, arbitrary, and egregious that the Due Process Clause would not countenance it even were it accompanied by full procedural protection.'" *Id.* (quoting *Anthony*, 339 F.3d at 143 (internal quotation marks omitted)) (citing *Cox v. Warwick Valley Cent. Sch. Dist.*, 654 F.3d 267, 275 (2d Cir. 2011) ("Only the most egregious official conduct can be said to be arbitrary in the constitutional sense and therefore unconstitutional.") (internal quotation marks omitted)); *see also Licorish-Davis v. Mitchell*, No. 12-CV-601 (ER),

---

[4] The Amended Complaint briefly mentions the right to equal protection of the law.  However, the Amended Complaint contains no well-pleaded factual allegations that would support such a claim.

2013 WL 2217491, *7 (S.D.N.Y. May 20, 2013) (noting that "[t]o establish a violation of substantive due process, a plaintiff must demonstrate that the state action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" (quoting *Southerland*, 680 F.3d at 151 (quotations and citation omitted))).

Furthermore, "[a]lthough the Second Circuit has described the interest of a parent in the custody of [his] child as 'a fundamental constitutionally protected liberty interest,' *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996), it has held that '[n]o matter how important the right to family integrity, it does not automatically override the sometimes competing "compelling government interest in the protection of minor children, particularly in circumstances where the protection is considered necessary as against the parent[ himself]."'" *Licorish-Davis*, 2013 WL 2217491, at *7 (quoting *Kia P.*, 235 F.3d at 758 (quoting *Wilkinson*, 182 F.3d at 104)). Therefore, "in recognition of the need for '"unusual deference in the abuse investigation context," 'a child abuse investigation will '"pass[] constitutional muster provided simply that case workers have a "reasonable basis" for their findings of abuse."'" *Id.* (quoting [*Kia P.*, 235 F.3d] at 758-59 (quoting *Wilkinson*, 182 F.3d at 104) (internal citation omitted))). "'The "reasonable basis" test "permit[s] investigators considerable discretion" in their handling of abuse claims, as well as a measure of judicial "deference" in the review of investigators' conduct.'" *Id.* (quoting *E.D. Tuffarelli*, 692 F. Supp. 2d 347, 360 (S.D.N.Y. 2010) (quoting *Wilkinson*, 182 F.3d at 104, 106), *aff'd*, 408 F. App'x 448 (2d Cir. 2011)). "Thus, '"[a] mere failure to meet local or professional standards, without more, should not generally be elevated to the status of constitutional violation."'" *Id.* (quoting [*E.D.*, 692 F. Supp. 2d at 360] (quoting *Wilkinson*, 182 F.3d at 106)).

To support his claim that certain employees of Defendant County's Department of Social Services violated his right to substantive due process, Plaintiff Father alleges that "[t]he March

2018 Neglect Petitions [that Schenectady County DSS employees filed] were filed as a

consequence of the Schenectady County DSS' gross negligence and/or with deliberate, knowing

indifference, and without regard to internally created standards (to the extent they existed) and in

contradiction of uniform and universally accepted best practices." *See* Dkt. No. 11, Amended

Complaint, at ¶ 128.  Specifically, he alleges the following:

> (1) on February 24, 2018, DSS received an anonymous Hotline
> Report pertaining to his Child in which the caller alleged that "the
> Child had reported to the caller information that suggested that the
> Child had and possibly still was, sustaining physical and sexual
> abuse at the residence of the Mother by others at that household,"
> and informed DSS 'that [Plaintiff] Father was not aware, let alone
> involved, in the decision to make the call," *see id.* at ¶¶ 16-17;

> (2) on February 27, 2018, Mr. "Harvey, as the primary DSS
> caseworker assigned to this matter, contacted the Mother and
> advised her that a hotline report had been made by a third party,"
> *see id.* at ¶ 19, but "did not advise [Plaintiff] Father of the hotline
> report," *see id.* at ¶ 20;

> (3) "[w]ithholding information from a parent as to whether a
> hotline report pertaining to their child has been made is a violation
> of accepted policies and procedures of Schenectady County DSS,"
> *see id.* at ¶ 22;

> (4) "[o]n February 17, 2018, Schenectady County DSS held a
> Multi-Disciplined Team meeting ("MDT")," *see id.* at ¶ 23, and
> that in attendance at the meeting were "Harvey, Pilczuk, and
> Bolognino, other DSS supervisors and members of the
> Schenectady County District Attorney's office," *see id.* at ¶ 25;

> (5) at the MDT meeting, "those in attendance made allegations that
> [Plaintiff] Father had coached the Child to make disclosures so as
> to prompt the 2/24/18 Hotline Report," *see id.* at ¶ 25;

> (6) at the time of the MDT meeting, "Schenectady County DSS a.
> had no information, let alone evidence, that [Plaintiff] Father had
> any involvement in the 2/24/18 Hotline Report; b. had no evidence
> that the contents of the 2/24/18 Hotline Report had originated from
> [Plaintiff] Father; c. had no evidence that the contents of the
> 2/24/18 Hotline Report were false or inaccurate; and, d. had not

commenced any investigation yet, including interviewing the Child, as to the contents of the report," *see id.* at ¶ 26;

(7) On February 28, 2018, Harvey telephoned the Mother and gave her instruction "as to when and where a forensic interview of the Child was to take place," *see id.* at ¶ 27; he also "told the Mother that Schenectady County DSS was filing a violation petition against the Father in Family Court arising out of the unsubstantiated premise that [Plaintiff] Father had coached the child to disclose the information as contained in the 2/24/18 Hotline Report," *see id.* at ¶ 28;

(8) At the time of Harvey's February 28, 2018 call to the Child's Mother, "Schenectady County DSS a. had no evidence that [Plaintiff] Father had any involvement in the 2/24/18 Hotline Report; b. had no evidence that the contents of the 2/24/18 Hotline Report had originated from [Plaintiff] Father; c. had no evidence that the contents of the 2/24/18 Hotline Report were false or inaccurate; and d. had not commenced any investigation yet, including interviewing the Child," *see id.* at ¶ 30; "Harvey's decision to advise the Mother that petitions would be filed at the time of February 28th, 20018, violated the policies and procedures of Schenectady County DSS," *see id.* at ¶ 31;

(9) "Employees, agents of and representatives of Schenectady County DSS have attempted forensic questioning of the Child without informing or obtaining permission of [Plaintiff] Father on more than one occasion," *see id.* at ¶ 32; and "Schenectady County DSS has subjected the Child to several unnecessary traumatizing forensic interviews," *see id.* at ¶ 33, the last of which, "after petitions were filed in March of 2018, . . . was done by an unqualified and third party, Wales Brown, an employee of defendant, Northeast, at the behest and direction of the County," *see id.* at ¶¶ 33-34;

(10) "The failure in March 2018 to advise [Plaintiff] Father that a forensic interview of his child was contemplated let alone taking place was in contravention of accepted standards and practices employed by Schenectady County DSS," *see id.* at ¶ 58;

(11) "[DSS Employee] Pilczuk did not record or otherwise take contemporaneous notes during any portions of the 3/1/18 Forensic Interview," *see id.* at ¶ 59; rather, she entered "[a]ll information concerning the 3/1/18 Forensic Interview . . . into Schenectady County DSS Progress Notes the next day, and exclusively from memory, *see id.* at ¶ 60; and "[a]t the time of the 3/1/18 Forensic

Interview, Pilczuk did not take any measures in order to ensure the accuracy of information obtained, *see id.* at ¶ 61; "[t]he failure to record or take contemporaneous notes during the 3/1/18 Forensic Interview was in contravention of best practices or accepted professional standards for such interviews, *see id.* at ¶ 62;

(12) "[d]uring the 3/1/18 Forensic Interview Pilczuk confirmed and validated that the following information, as conveyed by the 2/24/18 Hotline Report, was accurate: a. that the boyfriend of the Mother had on at least one occasion kicked the Child; and b. that the Boyfriend's daughter had at least on one occasion 'karate' kicked the Child and caused a bruise," *see id.* at ¶ 63; "Pilczuk arrived at the conclusion that the physical contacts . . . were unintentional, solely on the basis of the Child's opinion (who was only eight years old at the time), *see id.* at ¶ 64;

(13) "At the time of the 3/1/18 Forensic Interview, Pilczuk and Schenectady County DSS had been made aware that there had been ongoing allegations from several sources that the Child was exhibiting bruising on a regular basis while at the Mother's household," *see id.* at ¶ 66, and "[n]otwithstanding the foregoing, Pilczuk did not attempt, let alone ascertain, whether the physical contact as described in the previous paragraphs caused bruising," *see id.* at ¶ 67;

(14) "The failure of Pilczuk or any other employee of Schenectady County DSS to reconcile or otherwise compare the information obtained at that interview with the contents of the 2/24/18 Hotline Report[,] [u]pon information and belief . . . was in contravention of accepted norms and practices employed by Schenectady County DSS and in contravention of best practices or accepted professional standards for such interviews," *see id.* at ¶ 72;

(15) "The Progress Notes maintained by Schenectady County DSS do not reflect that the County had any evidence to suggest that [Plaintiff Father] had coached the Child or otherwise participated in or allowed neglect of the Child to have occurred such as to warrant the filing of any additional Article 10 FCA petition," *see id.* at ¶ 87;

(16) Schenectady County DSS made no attempt "to contact [Plaintiff] Father to obtain any information or possible explanation of the events leading up to the 2/24/18 Hotline Report," *see id.* at ¶ 93;

(17) "On March 5th and 6th, 2018, the Schenectady Family Court held an Emergency Hearing at the request of Schenectady County DSS at which time all parental time afforded to [Plaintiff] Father was terminated.  [Plaintiff] Father was also instructed by DSS that in order to preserve any time he wanted to have with [h]is daughter, he had to recommence supervised visits with Wales Brown," *see id.* at ¶ 95;

(18) "The March 2018 Neglect Petitions were based upon allegations that were manufactured, intentionally misrepresented and/or false.  Further, they were, including but not limited to, as follows: a. based upon facts that were obtained or created with knowing disregard as to their accuracy and legitimacy; b. based upon allegations that were recklessly and negligently obtained; and c. based upon allegations and facts knowingly incapable of supporting any finding of neglect as defined under New York law," *see id.* at ¶ 120; and

(19) "Schenectady County DSS continued to prosecute the March 2018 Neglect Petitions after having been apprised of the foregoing misfeasance," *see id.* at ¶ 122.

Since this is a motion to dismiss, the Court must accept, as true, all of the well-pleaded allegations in the Amended Complaint.  It is a very close call as to whether these allegations alone demonstrate that the actions of Defendant County's DSS's employees were so egregious that they would shock the contemporary conscience.  *See Licorish-Davis*, 2013 WL 2217491, at *7.  However, Plaintiff Father also alleges that certain DSS employees did not have a reasonable basis for their findings of abuse and that, had they conducted an appropriate investigation, they would have realized that there was no basis for such findings.  This allegation, combined with those discussed above, just barely raises Plaintiff Father's claim that certain DSS employees violated his right to substantive due process above the speculative level.[5]

---

[5] The Court notes, however, that it has serious doubts that Plaintiff Father's claim would survive a motion for summary judgment.

Having found that Plaintiff Father's claim that certain of Defendant County's employees violated his right to substantive due process, the Court must next consider whether Plaintiff Father has sufficiently alleged that Defendant County is liable for its employees' actions under § 1983.  A municipality, such as Defendant County, may be held liable under § 1983 only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation."  *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dept. of Social Servs.*, 436 U.S. 658, 692, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978)).  In other words, municipalities are "responsible only for 'their own illegal acts,'" and cannot be held "vicariously liable under § 1983 for their employees' actions."  *Id.* (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479, 106 S. Ct. 1292, 89 L. Ed. 2d 452 (1986) (citations omitted)). Instead, a "plaintiff must demonstrate that, through its deliberate conduct, the municipality was the 'moving force' behind the alleged injury."  *Roe v. City of Waterbury*, 542 F.3d 31, 37  (2d Cir. 2008) (quoting *Brown*, 520 U.S. at 404, 117 S. Ct. 1382).  Thus, to establish municipal liability under § 1983, a plaintiff "must prove that 'action pursuant to official municipal policy' caused their injury."  *Connick v. Thompson*, 563 U.S. at 61 (quotation omitted).

"A municipal policy may be pronounced or tacit and reflected in either action or inaction."  *Cash v. Cnty. of Erie*, 654 F.3d 324, 334 (2d Cir. 2011).  "In the latter respect, a 'city's policy of inaction in light of notice that its program will cause constitutional violations is the functional equivalent of a decision by the city itself to violate the Constitution.'"  *Id.* (quoting *Connick v. Thompson*, 131 S. Ct. at 1360 (internal quotation marks omitted)) (citing *City of Canton v. Harris*, 489 U.S. at 396, 109 S. Ct. 1197 (O'Connor, J., concurring in part and dissenting in part) ("Where a § 1983 plaintiff can establish that the facts available to city policymakers put them on actual or constructive notice that the particular omission is

substantially certain to result in the violation of the constitutional rights of their citizens, the dictates of *Monell* are satisfied.")).  "Consistent with this principle, 'where a policymaking official exhibits deliberate indifference to constitutional deprivations caused by subordinates, such that the official's inaction constitutes a deliberate choice, that acquiescence may be properly thought of as a city policy or custom that is actionable under § 1983.'"  *Id.* (quoting *Amnesty Am. v. Town of W. Harford*, 361 F.3d 113, 126 (2d Cir. 2004) (Sotomayor, J.) (internal quotation marks omitted)).

"'Deliberate indifference' is a stringent standard of fault[.]"  *Connick v. Thompson*, 562 U.S. at 61 (quoting *Board of Cnty. Comm'rs v. Brown*, 520 U.S. at 410) and "necessarily depends on a careful assessment of the facts at issue in a particular case[.]"  *Cash*, 654 F.3d at 334 (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d at 128 (holding that deliberate indifference determination "need not rely on any particular factual showing")).  "The operative inquiry is whether those facts demonstrate that the policymaker's inaction was the result of 'conscious choice' and not 'mere negligence.'"  *Id.* (quoting [*Amnesty Am.*, 361 F.3d at 128] (internal quotation marks omitted)) (other citation omitted).  Therefore, "deliberate indifference may be inferred where 'the need for more or better supervision to protect against unconstitutional violations was obvious,' *Vann v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995), but the policy maker 'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs,' *Reyonds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007)."  *Id.* (citations omitted).  "'An obvious need may be demonstrated through proof of repeated complaints of civil rights violations; deliberate indifference may be inferred if the complaints are followed by no meaningful attempt on the part of the municipality to investigate or to forestall further incidents.'"  *Id.* (quoting *Vann*

*v. City of New York*, 72 F.3d 1040, 1049 (2d Cir. 1995) (citing *Ricciuti*, 941 F.2d at 123; *Fiacco*, 783 F.2d at 328)).

"[A] municipality can be liable under § 1983 only where its policies are the 'moving force [behind] the constitutional violation.'  Only where a municipality's failure to train its employees in a relevant respect evidences a 'deliberate indifference' to the rights of its inhabitants can such a shortcoming be properly thought of as a city 'policy or custom' that is actionable under § 1983." *City of Canton v. Harris*, 489 U.S. 378, 389 (1989).  Furthermore, "*Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees . . . represents a policy for which the city is responsible."  *Id.* (footnote omitted).  "In resolving the issue of a city's liability, the focus must be on adequacy of the training program in relation to the tasks the particular [employees] must perform.  That a particular [employee] may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomngs may resulted from factors other than a faulty training program."  *Id.* at 390-91 (citations omitted).  "Neither will it suffice to prove that an injury or accident could have been avoided if an [employee] had better or more training, sufficient to equip [that employee] to avoid the particular injury-causing conduct.  Such a claim could be made about almost any encounter resulting in injury, yet not condemn the adequacy of the program to enable [employees] to respond properly to the usual and recurring situations with which they must deal.  And plainly, adequately trained [employees] make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable."  *Id.* at 391.

"To adopt lesser standards of fault and causation would open municipalities to unprecedented liability under § 1983."  *Id.*  "In virtually every instance where a person has had

his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point

to something the city 'could have done' to prevent the unfortunate incident." *Id.* at 392 (citing

*Oklahoma City v. Tuttle*, 471 U.S., at 823, 105 S. Ct. at 2436 (opinion of Rehnquist, J.)).

Therefore, "permitting cases against cities for their 'failure to train' employees to go forward

under § 1983 on a lesser standard of fault would result in *de facto respondeat superior* liability

on municipalities – a result rejected in *Monell*, 436 U.S. at 693-694, 98 S. Ct., at 2037.  It would

also engage the federal courts in an endless exercise of second-guessing municipal employee-

training programs.  This is an exercise we believe the federal courts are ill suited to undertake, as

well as one that would implicate serious questions of federalism." *Id.* (citation omitted).

In *Walker v. New York*, 974 F.2d 293 (2d Cir. 1992), the Second Circuit, based on the

decisions of the Supreme Court, "discern[ed] three requirements that must be met before a

municipality's failure to train or supervise constitutes deliberate indifference to the constitutional

rights of citizens." *Id.* at 297.  "First, the plaintiff must show that a policymaker knows 'to a

moral certainty' that her employees will confront a given situation. . . . Thus, a policymaker does

not exhibit deliberate indifference by failing to train employees for rare or unforeseen events."

*Id.*  "Second, the plaintiff must show that the situation either presents the employee with a

difficult choice of the sort that training or supervision will make less difficult or that there is a

history of employees mishandling the situation." *Id.*  "Finally, the plaintiff must show that the

wrong choice by the city employee will frequently cause the deprivation of a citizen's

constitutional rights. . . . Thus, municipal policymakers may appropriately concentrate training

and supervision resources on those situations where employee misconduct is likely to deprive

citizens of constitutional rights. . . ." *Id.* at 298 (internal citation omitted).  Furthermore, the

court stated that, "[w]here the plaintiff establishes all three elements, then [the court] think[s]

that it can be said with confidence that the policymaker should have known that inadequate training or supervision was 'so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Id.* at 298 (quoting [*City of Canton*, 489 U.S. at 390]).

Furthermore, "[f]ailure to train is actionable as a municipal policy only if 'the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need.'" *Vogelsang by Seeber v. Cnty. of Cayuga*, No. 95-CV-1123 RSP/DS, 1998 WL 146293, *5 (N.D.N.Y. Mar. 25, 1998) (Pooler, then-D.J.) (quoting *City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989)).  With regard to the 'difficult choice" element of such a claim, a plaintiff "may demonstrate that a situation presents a difficult choice in either of two ways: (1) handling the situation requires more than common sense or (2) the employee has 'powerful incentives to make the wrong choice.'" *Id.* at *16 (quoting [*Walker*, 974 F.2d] at 297).

In the Amended Complaint, Plaintiff Father alleges that "[t]he March 2018 Neglect Petitions were filed as a consequence of the Schenectady County DSS' gross negligence and/or deliberate, knowing indifference, and without regard to internally created standards (to the extent they existed) and in contradiction of uniform and universally accepted best practices." *See* Dkt. No. 11, Amended Complaint, at ¶ 128.  Plaintiff Father further argues "[t]hat deliberate, and knowing indifference of Schenectady County DSS is evidenced by and as  a consequence of their employees, as follows:

> a. conduct[ing] repeated unnecessary and emotionally abusive forensic interviews of the Child; b. allowing an unqualified, unlicensed third party to conduct an unnecessary and emotionally abusive forensic interview of the Child; c. fail[ing] to properly

> train their employees, or to knowingly allow employees to fail to
> adhere to proper and accepted practices, for i. conducting an
> investigation of abuse and/or neglect as reported outside the
> confines of a "hotline" call; ii. conducting an investigation of abuse
> and/or neglect as reported from a "hotline" call; iii. conducting a
> forensic interview of a child alleged to have been the subject of
> abuse or neglect; iv. avoiding bias, implicit or explicit with regard
> to such investigations and interviews; v. recording or otherwise
> documenting actions, conclusions and information arising from
> such investigations and interviews; vi. . . . creating standards and
> procedures for investigations and interviews; vii. . . . implementing
> standards and procedures to ensure compliance of internal,
> Statewide and universally accepted practices for investigations and
> interviews; [and] d. . . . failing to create or otherwise provide
> accepted policies and procedures.

*See id.* at ¶ 129.

Plaintiff Father appears to allege that Defendant County was deliberately indifferent to his constitutional rights because it failed to train its employees in the correct way to conduct an investigation of child abuse and to keep proper records of any such investigation.  Plaintiff, however, never identifies the relevant policymaker.[6]  It is certainly plausible that the appropriate policymaker would know to a moral certainty that DSS's employees would conduct investigations into allegations of child abuse, whether they received such allegations from a hotline call or otherwise.  However, although Plaintiff Father alleges that Ms. Pilczuk did not follow the appropriate policies or procedures during her investigation of allegations of child abuse in this case by failing to keep contemporaneous notes, failing to post her notes in the system for doing so, and conducting or being part of forensic interviews of the Child, among other things, he does not allege how conducting an investigation into allegations of child abuse presents Ms. Pilczuk, or any other DSS employee, with difficult choices that would be made less difficult by training or supervision.  Nor does Plaintiff Father allege that the policymaker for

---

[6] Defendant County notes that the appropriate policymaker would be the Director of DSS.

DSS had received any – let alone repeated – complaints that DSS employees had violated anyone's civil rights during the course of conducting investigations into allegations of child abuse.

In addition, Plaintiff Father has not alleged facts that suggest that the proper handling of an investigation into allegations of child abuse requires more than common sense; nor has he alleged that DSS' employees, including the three employees he mentions in his Amended Complaint – Ms. Pilczuk, Mr. Harvey and Ms. Eileen Bolognino – had a powerful incentive to make a wrong choice.

Finally, although Plaintiff Father has arguably alleged facts that would support a finding that Ms. Pilczuk, and perhaps Mr. Harvey, made some mistakes in their investigation of the allegations of child abuse in this case, which Plaintiff Father alleges violated his constitutional right to substantive due process, he has not alleged sufficient facts to support a finding that the handling of the subject investigation, although perhaps negligently or even grossly negligently performed, was the result of Defendant County's deliberate indifference or failure to train its employees.

Therefore, for all of the above-stated reasons, the Court finds that Plaintiff Father has not adequately alleged a *Monell* claim against Defendant County and grants Defendant County's motion to dismiss Count 1 of the Amended Complaint against it.


F.     **Defendant Northeast Parent and Child Services, Inc.**

The only claim that Plaintiffs assert against Defendant Northeast is Count IV, which is a state-law negligent claim.  Since the Court has dismissed all of the federal claims in this action,

which pertain only to Defendant County,[7] the Court declines to exercise supplemental jurisdiction over Plaintiffs' state-law negligence claim against Defendant Northeast, as well as all counterclaims and/or crossclaims associated with that claim, pursuant to 28 U.S.C. § 1367(c)(3).

## IV. CONCLUSION

After reviewing the entire file in this matter, the parties' submissions, and the applicable law, and for the above-stated reasons, the Court hereby

**ORDERS** that the *Rooker-Feldman* doctrine does not bar the Court from exercising subject matter jurisdiction over this matter; and the Court further

**ORDERS** that Defendant County's motion to dismiss Count IV of the Amended Complaint, *i.e.*, the state-law negligence claim against it, *see* Dkt. No. 36, as time-barred is **GRANTED**; and the Court further

**ORDERS** that Defendant County's motion to dismiss all claims against Schenectady County Department of Social Services, *see* Dkt. No. 36, is **GRANTED** because Schenectady County Department of Social Services is not a suable entity; and the Court further

**ORDERS** that Defendant County's motion to dismiss Counts II and III – both § 1983 conspiracy claims – against it, *see* Dkt. No. 36, is **GRANTED**; and the Court further

**ORDERS** that Defendant County's motion to dismiss all of Plaintiff Grandparents' claims against it because Plaintiff Grandparents do not have a constitutional right to visitation with their granddaughter, *see* Dkt. No. 36, is **GRANTED**; and the Court further

---

[7] Counts I, II, and III are federal claims brought pursuant to 42 U.S.C. § 1983 and do not implicate Defendant Northeast because there are no well-pleaded factual allegations in the Amended Complaint that suggest that Defendant Northeast was a state-actor.

**ORDERS** that Defendant County's motion to dismiss Plaintiff Father's *Monell* claim against it (Count I), *see* Dkt. No. 36, is **GRANTED**; and the Court further

**ORDERS** that Plaintiffs' state-law claim for negligence against Defendant Northeast, as well as all counterclaims and/or crossclaims associated with that claim, is **DISMISSED without prejudice** pursuant to 28 U.S.C. § 1367(c)(3); and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in favor of Defendants and close this case.

**IT IS SO ORDERED.**

Dated: August 1, 2023
　　　　Syracuse, New York

Frederick J. Scullin, Jr.
Senior United States District Judge

- 29 -